IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL C. TAYLOR, JR., | ) | Case No. 3:17-cv-1448 |
| | ) | |
| Petitioner, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| JEFFREY B. NOBLE, Warden, | ) | |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.     Introduction

Petitioner Michael Taylor, Jr., an Ohio prisoner serving two consecutive prison terms of life without the possibility of parole plus mandatory, consecutive prison terms for firearm specification convictions, seeks a writ of habeas corpus under 28 U.S.C. § 2254.  Taylor claims that his convictions and sentences in *State v. Taylor*, Case No. CR-14-2533, violated his constitutional rights.  ECF Doc. 1.  Respondent, Warden Jeffrey Noble, filed a return of writ on October 20, 2017.  ECF Doc. 7.  Taylor filed a traverse on November 20, 2017.  ECF Doc. 8. This matter is before me by an automatic order of reference under Local Rule 72.2 for preparation of a report and recommendation on Taylor's petition.[1]  Because all of Taylor's claims are procedurally defaulted, incognizable, or meritless, I recommend that the Court deny Taylor's petition.

---

[1] Chief Judge Patricia A. Gaughan also issued a differentiated case management initial order for administrative track cases reflecting the automatic order of reference.  (EFC Doc. 2).

## II.      State Court History

### A.      State Trial Court Proceedings, Case No. CR-14-2544

On September 26, 2014, the Lucas County, Ohio grand jury indicted Taylor on two counts of aggravated murder in violation of Ohio Rev. Code § 2903.01(A) and (F), each with a three-year firearm specification under Ohio Rev. Code § 2941.145.  ECF Doc. 7-1 at 3-6.  On October 10, 2014, Taylor pleaded not guilty.  ECF Doc. 7-1 at 7.

Taylor's trial began on May 5, 2015, and on May 14, 2015, the jury found Taylor guilty of all counts.  ECF Doc. 7-1 at 8-9.  On May 18, 2015, the court sentenced Taylor to two consecutive life terms without the possibility of parole plus mandatory, consecutive three-year prison terms for each of the firearms specifications.  ECF Doc. 7-1 at 10-11.

### B.      Direct Appeal, Case No. L-15-1151

On June 3, 2015, Taylor, through counsel, appealed to the Ohio Court of Appeals.  ECF Doc. 7-1 at 12-15.  Taylor raised the following assignments of error:

1.  The Trial Court erred in allowing the State of Ohio to present inadmissible hearsay without first independently proving a conspiracy.

2.  Appellant's convictions for aggravated murder fell against the manifest weight of the evidence.

ECF Doc. 7-1 at 21.[2]  In essence, Taylor asserted that the trial court violated his Confrontation Clause rights when it permitted the government to offer the out-of-court statements of the deceased, Christian Snow-Veley, through witnesses Christian Jackson and Shawnita Williams before independent evidence of a conspiracy was put before the jury.  *Id.* at 36-38.  On September 16, 2016, the Ohio Court of Appeals affirmed Taylor's convictions and sentences.

---

[2] Although Taylor asserted the foregoing assignments of error, the body of his brief phrased Assignment of Error 1 as follows: "The Trial Court erred in allowing the out of court statements of Christian Snow-Veley into evidence through third party witnesses."

ECF Doc. 7-1 at 75-103.  The court of appeals determined that the trial court properly admitted Jackson's and Williams' testimony about Snow-Veley's statements as statements by an alleged co-conspirator, because the prosecutor had presented independent, *prima facie* evidence of a conspiracy, albeit after Jackson and Williams' testimony was received.  ECF Doc. 7-1 at 82, 87. The court of appeals also overruled Taylor's manifest weight of the evidence assignment of error because the jury reasonably concluded that Taylor was guilty on both counts based on the evidence presented at trial.  ECF Doc. 7-1 at 102.

### C.  Motion for Delayed Appeal to the Ohio Supreme Court, Case No. 2016-1729

On November 18, 2016, Taylor filed a *pro se* notice of appeal and motion for leave to file an untimely direct appeal to the Ohio Supreme Court.  ECF Doc. 104-13.  The court received his notice of appeal and motion on November 21, 2016.  ECF Doc. 7-1 at 104, 107.  Taylor's motion asserted that he failed to timely appeal the Ohio Court of Appeals' September 2016 decision, because the correctional facility redirected the mail containing his notice of appeal to the cashier's office.  ECF Doc. 7-1 at 107-13.  In support of his motion, Taylor attached a November 2, 2016, "informal complaint resolution" form, in which he complained to prison staff:

> On 10/27/16 I drop off a package mark urger [*sic*] legal mail with my cash slip I ask for my cash slip to be time stamp as to when my mail would be process.  I was told by your staff that my cash slip or mail would'n make it out or process till the 31st My complaint US mail runs everyday my package sat that hole 48 hrs. Then the weekend an was send on Monday an it was clearly mark urgent legal mail.  The way I took it from your staff was there was no one to process cash slip. Legal mail for us is everyday must please try to do better to fix this problem.

ECF Doc. 7-1 at 111.  The prison staff responded, "We are not the post office.  We take mail to the U.S. Post Office Monday through Friday, [and] not Holidays.  If you use a cash slip, it sometimes has to clear the cashiers office.  Your mail went to the Post Office on the 28th."  ECF Doc. 7-1 at 110-11.  Taylor also attached a prison account withdrawal slip, which was stamped

"Legal Mail" and signed by a witness on October 31, 2016.  ECF Doc. 7-1 at 143.  On January

25, 2017, the Ohio Supreme Court denied Taylor's motion for delayed appeal and dismissed the

case.  ECF Doc. 7-1 at 144.

### D.    Petition to Vacate or Set Aside Judgment of Conviction or Sentence

Earlier, on August 24, 2016, Taylor filed a *pro se* post-conviction petition in the trial

court pursuant to Ohio Rev. Code § 2953.21.  ECF Doc. 7-1 at 145-48.  Taylor raised the

following claims for relief:

1.  *Crawford v. Washington* it is a violation of the United States Constitution to
    admit testimony of a witness who did not appear at trial (hearsay).

2.  Michael Taylor was violated his constitutional right to face his accuser in
    court also his right for the court to state to prove this charge by a
    (Constitutional Prima Facie) only hearsay was spoken.

ECF. Doc 7-1 at 145-60.  The state moved to dismiss Taylor's post-conviction petition

because: (1) the state trial court had no jurisdiction to entertain Taylor's petition while his

direct appeal was pending; and (2) Taylor's post-conviction petition was untimely.  ECF

Doc. 7-1 at 167-72.  After the Ohio Court of Appeals issued its September 2016 decision,

the state supplemented its motion to dismiss, arguing that *res judicata* barred Taylor's

petition because it presented the same claims that he presented on direct appeal.  ECF

Doc. 7-1 at 175-76.  On February 28, 2017, the trial court dismissed Taylor's petition

because *res judicata* barred his claims.  ECF Doc. 7-1 at 179-81.  Taylor did not appeal

the dismissal of his post-conviction petition.

### E.    App. R. 26(B) Application to Reopen Direct Appeal

On January 19, 2017, Taylor filed an untimely *pro se* App. R. 26(b) application to reopen

his direct appeal.  ECF Doc. 7-1 at 268-342.  In his application, Taylor alleged that his appellate

counsel was constitutionally ineffective for failing to preserve constitutional challenges to his

convictions.  *Id.*  The Ohio Court of Appeals denied Taylor's motion to reopen his direct appeal, and Taylor did not appeal that decision to the Ohio Supreme Court.  ECF Doc. 7-1 at 258-59.

### III.  Federal Habeas Corpus Petition

On July 10, 2017, Taylor filed his petition for writ of habeas corpus.  ECF Doc. 1.

Taylor's petition raises three grounds for relief:

> **GROUND ONE:**  Trial court violated Petitioner's Constitutional Rights under the Confrontation Clause.
>
> **Supporting Facts:**  The Trial court along with the Sixth District Court of Appeals failed to protect Petitioner Due Process Rights under the Sixth Amendment of the United States Constitution by allowing a 3rd Party violation to the Hearsay Rule based under Rule 804 Federal Rules of Evidence(B)(3)….  "Petitioner never confronted the witness or was unable to cross examine any witnesses.
>
> **GROUND TWO:**  The Sixth District Court of Appeals decision was unreasonable and clearly contrary to Well Established federal law. Petitioner was found not guilty of {Conspiracy} to commit;
>
> **Supporting Facts:**  The Sixth District Court of appeals allowed the decision of the trial court to stand, finding that the trial court made a Prima facie decision, However, the Sixth District Court of Appeals acknowledge the decision finding no conspiracy to commit, was made Sealen the Ballot of the impossibility of a Prima Facie.  Notably; The Evidence Rules and Federal Laws both Held ; that "the court must make a prima facie to prove Petitioner's involvement in murder, through audio tape; video tape or independent witness, {yet} all witnesses in the present case, all state they never herd Petitioner in this case, speak of any murder; In the present case, the Trial court allowed the violation of the Hearsay Rule 804(B)(3) when the trial court allowed the witness testify that they [heard] a {Deceased} man say Petitioner was involved in this case.
>
> Keeping in mind, the Sixth District Court of appeals failed to find Petitioner or prove Petitioner's involvement, the unreasonable application of federal law, and the Contrary to Federal Law consist of the facts of the case; If Petitioner [can't] be found guilty of the offense of Conspiracy, How can the Court of Appeals uphold a prima facie or find Petitioner guilty of a Homicide Where there is no facts or proof of his involvement, by the witnesses testimony in this case.
>
> **GROUND THREE:**  The Sixth District Court of appeals Decision was Contrary to Ohio Laws in violation of Manifest of Weight

**Supporting Facts:**  The Sixth District Court of Appeals decision was unreasonable Application of Federal Law based on the Sixth District Court of Appeals never Reviewed the complete Journal of the Expert Witness ; To witt; B.C.I. Forensic opinion or facts in this case, Notably; After careful review of the facts, this Federal Court would be reasonable to Determine the things testified in this case, was Against the laws of Physic, Science; and Biology….. Clearly, the erroneous testimony of the Witness that stated in part; Petitioner shot Mr. Snowveley {17} times on a snow white cloth couch, {yet} Forensic at the B.C.I. Never found a drop of blood on the couch at the scene or entire House, Witnesses said shooting took place at BCI also testified they never found or recover 9 missing shells or any evidence of a homicide, witch clearly witness testimony defies all logic of physics an biology to be shot 17 times and not bleed a pin drop or for (nine bullets) too phantom disappear from the body into thin air not to lodge in any walls defies (science) an logic, also Forensic Chief Coroner said victim was shot 8 times ballistics reveal possible three or more shooters, evidence an testimony conflict each other simply by (logic an science). The State will have this Honorable Court to believe that physic Science, an logic does not exist only in the Taylor household. This case involve much forensic biology science, physic, and mostly logic (petitioner) Michael Taylor ask this Honorable Court to please microscope the smallest element of testimony of BCI forensic; and investigate (please) the minutest detail of (CI) intel as BCI and Detective own testimony rebuttal in forensic evidence the scientific factor in this case (nothing) was found.

Petitioner stresses to this Honorable Court, the missing 9-Shells is significant to the truth of this case, along with the impeccable testimony of BCI (Forensic). The shells, the DNA the aftermath of someone being shot 17 times and the horrific blood lost that scientifically comes along with this act is biologically and logically impossible to by pass BCI scientifically.

ECF Doc. 1 at 4-7.

## IV.    Applicable Habeas Corpus Legal Principles

### A.    AEDPA Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs habeas corpus petitions filed after April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009).  AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh*, 521 U.S. at 333 n.7, and "demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24

(2002). When the claims presented in a habeas corpus petition have been presented to and decided on the merits by the state courts, a federal court may not grant relief unless the petitioner proves that the state court decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Habeas review is limited to the record that was before the state court when it adjudicated the claim on the merits. 28 U.S.C. § 2254(d)(2) (requiring petitioners that the state court's factual determination was unreasonable "in light of the evidence presented in the state court proceeding"); *Cullen v. Pinholster*, 563 U.S. 170, 185 & n.7 (2011) (holding that "evidence introduced in federal court has no bearing on § 2254(d)(1) review").

A decision is unreasonable only if it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any reasonable possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review, and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of that decision." *Harrington*, 526 U.S. at 88 (quoting *Yarborough v. Alvarado*, 541

U.S. 652, 664 (2004)).  This standard is intentionally "difficult to meet," because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Harrington*, 526 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 322 n.5 (1979)).

"Clearly established federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the United States Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *see also White v. Woodall*, 572 U.S. 415, 420 (2014) (holding that clearly established federal law includes "only the holdings," and not the dicta, of Supreme Court decisions).  Thus, to show that a decision was contrary to clearly established federal law, a habeas petitioner must show that the state court: (1) "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) "decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  The state court decision need only reach a result and apply reasoning consistent with Supreme Court precedent, and need not refer to, or even demonstrate awareness of, relevant Supreme Court cases.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

To show that a state court decision is an "unreasonable determination of the facts" under § 2254(d)(2), a petitioner has the burden of presenting clear and convincing evidence that the state court made a clear factual error.  *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003); *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  This is because AEDPA affords state court factual determinations a "presumption of correctness."  28 U.S.C. § 2254(e)(1).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Wood v. Allen*, 558 U.S. 290, 301 (2010).

### B.      Exhaustion and Procedural Default

Before a federal court can review a state prisoner's habeas petition, AEDPA requires that the state prisoner exhaust all available state remedies.  28 U.S.C. 2254(b), (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  To exhaust available remedies, the state prisoner must give state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) ("[T]he highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims.").  The exhaustion requirement "refers only to remedies still available at the time of the federal petition."  *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006) ("[S]tate-court remedies are . . . 'exhausted' when they are no longer available, regardless of the reason for their unavailability.").  It "does not require pursuit of a state remedy [when] such a pursuit is clearly futile."  *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).  If the highest court in a state has not reviewed the petitioner's federal constitutional claims, then federal courts may not review them either, except under strictly limited circumstances.

Separate from exhaustion requirement, the doctrine of procedural default bars federal court review of a habeas petitioner's federal constitutional claim when the petitioner failed to: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly present the claim before the state courts while state remedies were still available.  *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. 107, 125 n.28 (1982); *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  In determining whether there has been a procedural default, the federal court looks to the last explained state court

judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).

The Sixth Circuit has directed courts to apply a four-part test when the state argues that a state prisoner's claim is defaulted due to the prisoner's failure to observe a state procedural rule. *See Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin v.* Smith, 785 F.2d 135, 138 (6th Cir. 1986)).  First, the court determines whether the state prisoner failed to comply with an applicable state procedural rule.  *Id.*  Second, the "court must determine whether the state courts actually enforced the state procedural sanction – that is whether the state courts actually based their decisions on the procedural rule."  *Id.*  Third, the court decides whether the state procedural rule is an "adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim."  *Id.*; *see also Coleman v. Thompson*, 501 U.S. 722, 732-33 (1991) (explaining that the application of an "independent" state law ground must not rely in any part on federal law); *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009) (explaining that an "adequate" state procedural rule must be "firmly established and regularly followed" by state courts at the time it was applied).  Finally, the court must determine whether the petitioner "can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice."  *Williams*, 260 F.3d at 693.

When the state asserts that the prisoner failed to "fairly present" the federal constitutional claim in state court, the court looks to: (1) whether the petitioner failed to assert both the legal and factual basis for his claim through the state's ordinary review process; and (2) whether state law no longer allows the petitioner to raise his claim at the time he filed his federal habeas petition.  *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848, and *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).  Most importantly, the "'petitioner must present his

10

claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id.* (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).  "Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."  *Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) (citing *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001), *Scott v. Mitchell*, 209 F.3d 854, 865-68 (6th Cir. 2000), and *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985)).

A petitioner can overcome a procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered.  *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him."  *Id.*  "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Id.*  In assessing prejudice, the reviewing court should assume that the petitioner has stated a meritorious constitutional claim and proceed to discern whether the assumed constitutional error actually prejudiced the petitioner.  *Moore v. Carlton*, 74 F.3d 689, 691-92 (6th Cir. 1996); *see also United States v. Frady*, 456 U.S. 152, 170-72 (1982).  There is no prejudice when the petitioner does not show a reasonable probability of a different verdict had the alleged constitutional error not occurred.  *Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003).

"A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  Actual innocence means "factual innocence, not mere legal insufficiency."  *Bousley v. United States*, 523 U.S. 614, 623 (1998).  "To be credible, such a

11

claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

### C.    Cognizability

A claim that alleges only violations of state law is not cognizable in a federal habeas case, and it must be dismissed on that basis unless the state court ruling violates a federal constitutional right.  *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law.").  Further, a petitioner may not convert a claim asserting state law error into a constitutional claim, merely by alleging that the failure to follow a state rule violated his due process rights.  *Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but "the fundamental elements of fairness in a criminal trial.""); *see also Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted).  Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (stating that a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure).

Nevertheless, state court rulings on issues of state law may rise to the level of due process violations if they "'offend[] some principle of justice so rooted in the traditions and conscience

12

of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th

Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  Such rulings must be "so

egregious that [they] result in a denial of fundamental fairness."  *Bugh v. Mitchell*, 329 F.3d 496,

512 (6th Cir. 2003).  Fundamental fairness under the Due Process Clause is compromised when

"the action complained of . . . violates those 'fundamental conceptions of justice which lie at the

base of our civil and political institutions,' . . . and which define 'the community's sense of fair

play and decency.'"  *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal citations

omitted).  Thus, courts "have defined the category of infractions that violate 'fundamental

fairness' very narrowly."  *Id.*

## V.      Relevant Ohio Law

### A.      Time Limits for Direct Appeals

An Ohio criminal defendant has 30 days from the date his conviction and sentence

become final to file a timely direct appeal.  Ohio R. App. P. 4(A).  On direct appeal, the

appellant may only present claims based on issues captured in the trial court record.  *See State v.

Johnson*, No. 97698, 2012-Ohio-3812 at ¶28 (Ohio Ct. App., Aug. 23, 2012) ("On direct appeal

we are limited to a review of the trial record.").  In non-capital cases, an Ohio criminal defendant

must generally file a notice of appeal to the Ohio Supreme Court and memorandum in support of

jurisdiction within 45 days after the Ohio Court of Appeals' rules on the initial appeal.  *See* Ohio

S. Ct. Prac. R. 7.01(A)(1).  If the defendant fails to file a timely appeal from a court of appeals

decision affirming a felony conviction, the defendant may seek leave to file a delayed appeal to

the Ohio Supreme Court.  Ohio S. Ct. Prac. R. 7.01(A)(4).  If the defendant does not file a timely

appeal to the Ohio Supreme Court, and the Court does not grant a motion for a delayed appeal,

the Ohio Supreme Court is divested of jurisdiction over the defendant's appeal.  Ohio S. Ct. Prac.

R. 7.01(A)(1)(b) ("Except as provided in divisions (A)(2), (3), (4), (5), and (6) of this rule . . . the appellant's failure to file within this time period shall divest the Supreme Court of jurisdiction to hear the appeal.").

### B. Time Limits for Post-Conviction Motions

Ohio post-conviction procedure is governed by Ohio Rev. Code § 2953.21.  An Ohio criminal defendant must file his post-conviction motion within 365 days after: (1) the date on which the trial transcript is filed in the court of appeals in the direct appeal of the judgment of conviction; or (2) the date the time to file a timely direct appeal expired, if the defendant did not file a timely direct appeal.  Ohio Rev. Code § 2953.21(A)(2).  When a trial court dismisses a timely post-conviction petition, the court must "make and file findings of fact and conclusions of law with respect to such dismissal."  Ohio Rev. Code § 2953.21(D).  Nevertheless, "a trial court need not issue findings of fact and conclusions of law when it dismisses an untimely petition." *State ex rel. Kimbrough v. Greene*, 781 N.E.2d 155, 156 (Ohio 2002).  When a court dismisses a post-conviction petition as untimely, the dismissal order is immediately final and appealable. *State ex rel. Williams v. Krichbaum*, No. 07-MA-61, 2007-Ohio-3037 at ¶10 (Ohio Ct. App. June 15, 2007).

An unsuccessful post-conviction petitioner must initiate an appeal within 30 days of judgment, or within 30 days of the resolution of a post-judgment motion to file findings of fact and conclusions of law.  Ohio R. App. P. 4(A)(1), (B)(2)(D).  A court of appeals has no authority to grant a petitioner's motion for leave to file a delayed appeal in a post-conviction context. *State v. Harvey*, 428 N.E.2d 437, 438 (Ohio Ct. App. 1980).

## VI.    The Facts

Analysis of Taylor's petition begins with the facts recited in the Ohio Court of Appeals opinion on direct appeal.  These factual findings are presumed correct unless Taylor rebuts them with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Wiggins*, 539 U.S. at 528-29; *Burt*, 571 U.S. at 18.  The Ohio Court of Appeals found the following facts:

{¶ 3}   This case centers around the murders of three young men, two of whom were very closely associated with appellant.  Ultimately, appellant was charged with and convicted of the murders of those two men.

{¶ 4}   The first murder was that of Darren Smith.  Darren, of the Overton family, was killed on April 24, 2010, in approximately the 1300 block of Grand Avenue, in Toledo, Ohio.  At that time, appellant lived at 1346 Grand with his sons, Michael Taylor III ("Michael III") and Montelle Taylor.  On May 7, 2010, Michael III, appellant's oldest son, was charged with Darren's murder, and on January 27, 2012, convicted of Darren's murder.  Thereafter, Michael III was sentenced to 18 years to life in prison.

{¶ 5}   The second murder occurred during the early morning hours of June 10, 2011.  Sergeant Daniel Raab, with the Toledo Police Department, responded to a dispatch concerning a man found lying in the street.  Sergeant Raab discovered Montelle, appellant's youngest son, partly on the curb and partly on the street at West Bancroft and Auburn, in Toledo, Ohio.  Montelle was alive but had a serious gunshot wound to his body.  According to his testimony, Sergeant Raab asked Montelle where he was shot and Montelle pointed down the street.  Sergeant Raab then asked Montelle who shot him.  While gasping for breath, Montelle responded, "Little Chris."  Sergeant Raab asked Montelle a second time who the shooter was and Montelle stated, "Chris" and what sounded like "No-Veley."  Sergeant Raab later learned Chris Snow-Veley was the name associated with Little Chris.  Montelle died while being transported to nearby Toledo Hospital.  Montelle was officially pronounced dead at 1:45 a.m.

{¶ 6}   This same Chris or Christian Snow-Veley was the victim of the third murder.  Although appellant and Snow-Veley were unrelated, appellant treated Snow-Veley, who was a longtime friend to both Montelle and Michael III, as if he was another son.

{¶ 7}   According to the testimony of appellant's brother, Vincent Witcher, Snow-Veley was killed on May 27, 2013, by appellant and Elijah "Ratchet" Dyer ("Ratchet"), during a Memorial Day party held at appellant's house at 263 East Hudson Street in Toledo, Ohio.  After Snow-Veley was killed, his body was placed in a director's chair then put in the shower in the basement.  Snow-Veley's

15

body was then moved several times until it was left at an abandoned house on Streicher Street.

{¶ 8}   On July 31, 2013, two workers discovered the decomposed remains of a body in the stairway of an abandoned house on Streicher.  A Lucas County Deputy Coroner testified she discovered eight bullets in the corpse found at the abandoned house.  The eight bullets were from two different guns.  An expert in the field of forensic odontology, after comparing dental records of the remains to Snow-Veley's dental records, concluded the remains were indeed Snow-Veley.

{¶ 9}   Prior to these murders and over the course of several years, appellant had taken out numerous life insurance policies on Montelle, Snow-Veley, and Michael III.

{¶ 10} On August 1, 2014, Christian Jackson, who was friends with Snow-Veley and closely associated with appellant, was indicted for the murder of Montelle.  A year later, Jackson entered a guilty plea pursuant to *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L.Ed.2d 162 (1970), to one count of involuntary manslaughter and was sentenced to three years in prison.

{¶ 11} On September 26, 2014, appellant was indicted on two counts of aggravated murder, for the murders of Montelle and Snow-Veley.  Each count had an attendant firearm specification.  In the same indictment, Ratchet was charged with one count of murder, for Snow-Veley's murder, with a firearm specification. Appellant and Ratchet entered pleas of not guilty.

{¶ 12} Appellant's jury trial commenced on May 5, 2015.  Numerous witnesses were called to testify.  On May 14, 2015, the jury found appellant guilty of two counts of aggravated murder, in violation of R.C. 2903.01(A) and (F), and two firearm specifications.  He was sentenced to two consecutive terms of life in prison without the possibility of parole and a mandatory three years for each gun specification.

* * *

{¶ 20} Here, the record shows that early in appellant's trial, the state called [Shawnita] Williams to testify before [Christian] Jackson testified due to scheduling issues.  Williams testified that during the early morning hours of June 10, 2011, she was asleep at her apartment at Swan Creek Apartments on Airport Highway when she received a phone call from Snow-Veley.  In response to that call, Williams drove to Ottawa Drive to pick up Snow-Veley.  She waited for about ten minutes before Snow-Veley appeared with Jackson.  Snow-Veley appeared to be acting normally, but Jackson seemed a little edgy.  Williams then drove the men back to her apartment where they stayed until later that morning.

* * *

{¶ 22} . . . After additional questioning, the state asked Williams what Snow-Veley had told her. Appellant's counsel again objected, but the objection was overruled. Williams testified that appellant was supposed to pay Snow-Veley for killing Montelle and appellant had made payments to Snow-Veley "now and then, but I guess it wasn't enough for Christian [Snow-Veley]." Snow-Veley grew angrier over time at appellant and threatened to kill appellant if appellant did not pay Snow-Veley all of the money.

{¶ 23} After Snow-Veley went missing in May 2013, Williams thought appellant had done something to Snow-Veley. Williams said Snow-Veley knew appellant would cause harm to Snow-Veley someday.

{¶ 24} It is undisputed that Williams' testimony about her conversations with Snow-Veley was presented before the state established the existence of the conspiracy. Ideally, this testimony should have been presented after the state established a conspiracy existed. Nevertheless, so long as independent proof of the conspiracy was submitted before the case went to the jury, Williams' testimony was properly admitted by the trial court. Thus, the issue becomes whether the state made a prima facie showing of the existence of the conspiracy by independent proof.

{¶ 25} A review of the record shows the following evidence was adduced at trial.

{¶ 26} Toledo Police Officer Kristi Eycke testified she responded to the crime scene at Bancroft and Auburn on June 10, 2011, and was directed to ride in the ambulance with Montelle. Eycke believed Montelle died in the ambulance on the way to Toledo Hospital. Upon arrival at the hospital, Eycke stayed with Montelle's body. At some point, Eycke was informed appellant was also at Toledo Hospital, being treated for a stomach issue in the emergency room. Eycke did not make contact with appellant. Rather, she remained with Montelle's body for about half an hour or 45 minutes, until she was relieved by Detective Gene Kutz.

{¶ 27} Toledo Police Detective Kutz testified he went to Toledo Hospital on June 10, 2011 to investigate an individual who was shot. When Kutz arrived at the hospital he learned Montelle was pronounced dead at 1:45 a.m. Kutz was made aware that Montelle's family was at the hospital, and later, at about 3:30 a.m., Kutz met with appellant and Montelle's mother and notified them of Montelle's death. Montelle's mother was inconsolable while appellant did not appear distraught.

{¶ 28} Kutz testified appellant told him what had transpired earlier in the evening. Appellant said he was at his house with his son, when around 12:26 a.m. to 12:35 a.m., appellant drove himself to the hospital due to stomach ailments. When appellant left the house, Montelle was on the porch talking to a black male

17

on a bicycle. Montelle was on house arrest and was not supposed to leave the house.

{¶ 29} Phyllis Riley, Montelle's maternal grandmother, testified she lived in Detroit, Michigan, and got a call on June 10, 2011, at about 1:00 a.m. or 2:00 a.m., from her daughter who said to get down to Toledo because Montelle had been shot. When Riley arrived at Toledo Hospital, she saw her daughter and family, and was informed by a nurse that Montelle was deceased. Riley saw Montelle, then encountered appellant. She asked appellant where he had been and appellant said he was sick. Appellant said, "don't worry about it because I have a [insurance] policy. Appellant put on a fake cry and said, "I am so upset. You guys take care of this." Riley told appellant to do it himself as "[t]his is your baby." When Riley said this, appellant's fake tears stopped.

{¶ 30} Riley recalled in the first part of 2011, Montelle called her to tell her that he had gone out to breakfast with appellant and then had a physical. Montelle also said his dad had taken him for an insurance policy. Riley asked to speak to appellant and asked appellant how Michael III was doing, because he was in jail. Appellant said Michael III was doing okay and that is why appellant bought this insurance policy for Montelle "[i]n case something happened to him." Appellant said he made Montelle's mother the beneficiary of the life insurance policy on Montelle. Riley asked to speak with Montelle again and told Montelle to watch his back. Riley described appellant's relationship with Montelle and Michael. Appellant "has not been a role model father" and did not buy clothes for Montelle, provide a bed or properly care for Montelle. Appellant bought new clothes for Michael III and Michael III "was like the prodigal son."

{¶ 31} The state questioned Witcher, appellant's brother, about when appellant informed Witcher that Montelle had died. Witcher testified appellant called Witcher "[a]bout a little after one * * * 1:30 around that area" and told Witcher that Montelle had gotten shot and killed. Witcher remembered he wanted to buy beer at Petro's at Auburn and Monroe and the store closed at 1:00 a.m. Witcher was able to buy the beer and return to Fernwood, where he was living in an abandoned house owned by appellant, when he received the call. Witcher described Montelle as kind of slow.

{¶ 32} Williams testified concerning events which occurred within hours after Montelle's murder, including receiving a phone call from Snow-Veley, and in response, driving to pick him and Jackson up at Ottawa Drive, about a block away from Petro's.

{¶ 33} Ashley Smith testified she knew appellant, Montelle, Snow-Veley, Jackson, Witcher and Ratchet. Smith used to stay on Grand and the neighborhood was not safe. On the evening of June 10, 2011, Ashley drove by the Bancroft and Auburn area when she saw a lot of commotion, with people screaming. While stopped at the corner of Bancroft and Auburn, she saw a person on the ground and

a person fleeing, running across the parking lot away from Auburn.  The person running across the lot looked like Snow-Veley.  When Ashley was interviewed by police in 2011 she said Snow-Veley had a handgun in his left hand.  At trial, however, she did not remember that Snow-Veley was carrying anything when she saw him.

{¶ 34} Mary Taylor testified she had lived on Grand with appellant and her children but the house was burned down.  She described Grand as very dangerous with "[b]ullets flying everywhere."

{¶ 35} Mary said Montelle was like a son to her. Just before Montelle was murdered, Mary and appellant had gotten into an argument because appellant was spending so much time and money on Michael III's murder case.  On June 10, 2011, at about 4:00 or 5:00 a.m., appellant woke up Mary at her house on Clay Street and told her that Montelle had been killed.  Appellant was crying.  Mary screamed and cried and called her sister, Andrea Ankney.  Ankney came over and eventually left, driving appellant somewhere.  Later, appellant told Mary he had gone out to talk with Snow-Veley.

{¶ 36} Ankney testified she is Mary's cousin, but they are more like sisters.  On the morning of June 10, 2011, Mary called Ankney to say that Montelle had been killed.  Ankney drove over to pick up Mary and appellant, and Mary was crying but appellant was not.  Appellant was on his phone trying to get in contact his attorney so the attorney could accompany appellant downtown for questioning by the police about Montelle's death.

{¶ 37} Ankney testified Mary asked her to take appellant somewhere, so Ankney drove appellant to "the baby mother of Christian Snow-Veley out to Swan Creek apartments on Airport Highway."  Ankney waited in the car for appellant for over an hour.

{¶ 38} Tenille Galloway, appellant's former girlfriend and the mother of his daughter, Sidney Galloway, testified that shortly after Montelle's death, appellant notified her that she and Sidney were beneficiaries of the proceeds of two life insurance policies on Montelle.  Tenille never took out life insurance policies on Montelle nor did she ever name herself as a beneficiary of a life insurance policy on Montelle.  Tenille did, however, receive an $80,000 payout from the life insurance policies on Montelle following his death.

{¶ 39} The state offered into evidence at least eleven life insurance policies on Montelle for which appellant had applied.

{¶ 40} In addition, the state introduced a surveillance video taken at the time of the shooting.  The parties stipulated to the video.  The video camera was located in the back parking lot near where Montelle was shot.  The video shows three people walking together, then less than a minute later, two people are running in

the opposite direction from where the three people were walking.  Jackson was shown the video at trial and identified himself, Montelle and Snow-Veley as the three people shown walking in the video and then himself and Snow-Veley running because Montelle was just shot.

{¶ 41}  The state also presented three videotapes of appellant being interviewed by police.

{¶ 42}  Based upon the foregoing, we find the state made a prima facie showing of the existence of a conspiracy between appellant, Snow-Veley and Jackson to murder Montelle by independent proof.  Specifically, there was evidence that appellant knew about Montelle's death before he was informed by the police, Snow-Veley was identified running away from the area of Montelle's murder just after the murder occurred, Snow-Veley was with Jackson shortly after Montelle's murder and not far from the murder scene, after Montelle's murder appellant met with Snow-Veley and Jackson, appellant applied for numerous life insurance policies on Montelle, appellant's former girlfriend received money from insurance policies after Montelle's death, appellant tried to contact a lawyer before talking with police about Montelle's murder, and appellant did not seem upset by Montelle's death.  As there was sufficient independent evidence of a conspiracy, Williams' testimony regarding what Snow-Veley told her is admissible under Evid. R. 801(D)(2)(e).  Therefore, the trial court did not err in admitting Williams' testimony.  For the foregoing reasons, appellant's first assignment of error is not well-taken.

* * *

{¶ 49}  Christian Jackson testified he met Michael III when they were in the Ohio Department of Youth Services ("DYS") in 2007, then met appellant.  After Jackson was released from DYS, he went to appellant's house on Grand. Jackson was then sent to prison for 18 months.  After being released from prison, Jackson again went to appellant's house on Grand.  Later, Jackson was sent to the Corrections Center of Northwest Ohio ("CCNO") for six months.  After being released from CCNO, Jackson returned to appellant's house on Grand.

{¶ 50}  While living at appellant's house on Grand, Jackson would do jobs for appellant like beating people up and robbing people.  Appellant would compensate Jackson with clothes and cash. Jackson would do most of the jobs by himself, but sometimes he did jobs with Michael III or Snow-Veley.

{¶ 51}  Jackson met Snow-Veley in elementary school. In June 2011, Jackson would see Snow-Veley at appellant's house three or four times a week.  Snow-Veley did the same kind of work for appellant as Jackson did.

{¶ 52}  Jackson described Montelle as goofy, silly, loud and harmless.  Appellant treated Montelle like a burden and would call Montelle names, like slow.  Jackson

never saw appellant treat Montelle in a violent way, but did see Michael III act violently toward Montelle two or three times.  Appellant treated Michael III differently, "you could just tell it was love * * * [i]t was mutual respect."

{¶ 53}  Jackson knew Darren Smith "from being on Grand."  Appellant did not like Darren and did not want Jackson spending time with Darren, so Jackson went behind appellant's back and hung out with Darren.  Montelle also liked Darren and spent time with him.

{¶ 54}  On April 24, 2010, Jackson was on Grand when Michael III shot Darren. Darren fell in the street and Michael III took off.  Minutes later, appellant appeared at the scene and talked with police. Jackson talked with the police, but lied.  Montelle also the saw the shooting but he did not talk to the police.

{¶ 55}  After Michael III was arrested, appellant "was real pressed" to get Michael III out of jail.

{¶ 56}  Snow-Veley told Jackson that appellant wanted Snow-Veley to kill Montelle for some insurance money to bond Michael III out of jail and go to Florida.  Snow-Veley told Jackson "I'm going to cut you in, bro."

{¶ 57}  Jackson "pretty much knew" Montelle would be killed June 10, 2011. Jackson talked with appellant "[a]bout a robbery we was going to do" and Montelle was invited to go along.  However, Jackson, appellant and Snow-Veley had a conversation without Montelle "about money, and it was about Montelle getting killed."  Appellant handed Snow-Veley a gun.

{¶ 58}  Montelle, Jackson and Snow-Veley left appellant's house about 20 minutes after midnight on June 10, 2011.  Appellant had already left the home to "get on camera" at a hospital.  Jackson described the route the trio took until Montelle was shot by Snow-Veley.  Montelle took off running after he was shot and was chased by Snow-Veley, who fired a couple more shots.  Jackson and Snow-Veley left and made their way to Petro's.  The men went to a duplex on Bluff Street then were picked up by Williams and taken to her house on Airport. Jackson slept in the living room and when he woke up, appellant was at the apartment talking with Snow-Veley.  Jackson identified himself, Montelle and Snow-Veley on the surveillance video.

{¶ 59}  Sometime after Montelle was killed, appellant asked Jackson to kill Snow-Veley because "Snow-Veley was running his mouth and * * * if Christian didn't get shut up then everyone was going to be locked up for life for Montelle's death." Appellant handed Jackson a pistol.  Appellant told Jackson that Snow-Veley was owed some money and a house and if Jackson killed Snow-Veley, Jackson would get the money, house and maybe a car.  Jackson told appellant he would kill Snow-Veley, but never intended to kill him.  Jackson was in prison for an unrelated crime when Snow-Veley was killed.

{¶ 60} D'Antje Colvin testified she dated Snow-Veley for about two weeks in 2012, but stayed friends with him and in contact with him until he was murdered. Snow-Veley told D'Antje that the house on Grand belonged to him because appellant owed Snow-Veley money for some things Snow-Veley had done for appellant.  Snow-Veley told D'Antje that he set the house on Grand on fire for appellant and appellant had Snow-Veley kill Montelle for the insurance money. D'Antje told no one about this conversation until Detective Jeff Clark came to her house after Snow-Veley's body was found, then she told the detective.

{¶ 61} * * *

{¶ 69} A review of the record shows the state alleged appellant had Montelle killed for life insurance proceeds so that appellant would have funds to pay for Michael III's defense and get Michael III out of jail.  The state presented the following evidence in support of its allegations: appellant took out numerous life insurance policies on Montelle; appellant made a police report that Montelle committed aggravated menacing rather than Michael III; appellant paid a lawyer to prove the aggravated menacing charges against Michael III were false; appellant and Mary Taylor fought because appellant was spending so much time and money on Michael III's murder case; surveillance video showed Montelle, Snow-Veley and Jackson walking together before the shooting then Snow-Veley and Jackson running away after the shooting; Jackson identified himself, Snow-Veley and Montelle in the video; Ashely Smith recognized Snow-Veley as he ran away from Auburn and Bancroft; appellant gave himself an alibi at the time of Montelle's shooting by going to the hospital; appellant did not take any of the medicine prescribed by the doctor at the hospital; appellant told his brother about Montelle's death before the time that the nurse informed appellant of Montelle's death; after Montelle's death, appellant was taken out to where Snow-Veley and Jackson were located; Snow-Veley was like a son to appellant and appellant loved Jackson; appellant did not appear distraught after Montelle's death; and, appellant would not talk to police about Montelle's death without a lawyer.

{¶ 70} We find appellant's conviction for aggravated murder of Montelle Taylor is not against the manifest weight of the evidence.  We cannot say the evidence weighs heavily against a conviction, that the jury lost its way, or a miscarriage of justice has occurred.  Accordingly, appellant's second assignment of error is not well-taken as to appellant's conviction for aggravated murder of Montelle Taylor.

* * *

{¶ 73} Witcher testified he had been living in the basement of appellant's home at 263 East Hudson since early 2013.  Also living at the house at that time were appellant, Mary Taylor, Mary's children, Snow-Veley, and Ratchet.  During the Memorial Day party, Witcher played loud music from the basement of the home

while most of the party's attendees remained on the upper level and outside of the house.  Snow-Veley wanted money so appellant told Snow-Veley to come over.

{¶ 74} Witcher testified while appellant and Witcher were in the basement bagging up marijuana and Snow-Veley was rolling marijuana, appellant instructed Witcher to begin laying carpet on the steps so if "[a]nything else go wrong there would not have been no blood trail on the steps."  Witcher then witnessed appellant place a sweet potato on a revolver.  As Witcher was nailing carpet to the steps, he heard appellant shoot Snow-Veley.  Snow-Veley was shot in the back of the head but was still alive.  Snow-Veley and appellant fought and Witcher broke them up. Appellant shot Snow-Veley again.  By then, Snow-Veley was on a loveseat in the basement; appellant again shot Snow-Veley, this time in the back.

{¶ 75} Witcher testified Ratchet came downstairs to the basement and asked appellant for a gun.  Appellant gave Ratchet an automatic gun and Ratchet shot Snow-Veley twice in the back of the head, killing him.  Afterwards, appellant and Ratchet sat Snow-Veley's body in a director's chair and placed it in the shower. The carpet and loveseat cushions were thrown in the trash.

{¶ 76} Witcher testified after the party ended, appellant and Ratchet used a wheelchair to transport Snow-Veley's body from the basement of appellant's home to an abandoned house across the street, securing the body to the chair with bungee cords, where they dumped the body in the garage.  Witcher then witnessed appellant and Ratchet move the body from the abandoned garage and transport it to another abandoned house on Streicher Street.  The body was thrown in the basement.

{¶ 77} There were six life insurance policies taken out on Snow-Veley from August 20, 2011 to April 15, 2013, worth a combined total of $460,000.  Among the named beneficiaries of these policies were Tenille Galloway, who was listed as Snow-Veley's mother, and Sidney, who was listed as Snow-Veley's sister.

{¶ 78} Tenille testified that although she and her daughter were listed as beneficiaries on Snow-Veley's life insurance policies, neither she nor Sidney had any familial relationship to Snow-Veley. Tenille never applied to take out a life insurance policy on Snow-Veley, nor did her 8 or 9-year-old daughter apply for a life insurance policy on Snow-Veley.  Tenille recognized appellant's phone number on several of the applications for life insurance on Snow-Veley.  In addition, Tenille's address was listed on an application for life insurance on Snow-Veley, but Snow-Veley had never lived at her address.

{¶ 79} After Snow-Veley's body was discovered, Tenille learned from appellant that she was named as a contingent beneficiary on a life insurance policy on Snow-Veley, but she did not authorize that policy.  Tenille wrote a letter to the life insurance company and instructed the company to remove her name from the life insurance policy on Snow-Veley because she "didn't want anything to do with insurance money that could have been blood money basically."

{¶ 80} Mary Taylor testified at some point after Montelle was killed, Snow-Veley went to prison and when he got out, Snow-Veley "went back on Grand Street" which the neighborhood guys "kind of used * * * as a whore house." Mary testified Snow-Veley also came to live with her at the house on Hudson. Also living at the house on Hudson were appellant, Mary's seven children, Ratchet and Witcher.

{¶ 81} Mary testified about the 2013 Memorial Day get-together at the Hudson house. About 30 family and friends were at the gathering. Mary cooked "a Mexican fiesta, homemade tortillas things of that nature." When asked if appellant cooked, Mary said no and laughed. She explained she was laughing because he cannot cook. When asked if he did anything to help her cook, Mary said, "[i]f taking out the trash counts as cooking." While Mary was in the kitchen preparing the food, appellant was upstairs watching TV. Loud music was playing in the house. The neighbor, Joy, was washing clothes in Mary's basement because Joy's washer was broken. Joy lived two doors down the street from Mary. Throughout the day, Joy was back and forth between her own house and Mary's house doing four or five loads of laundry.

{¶ 82} Mary testified at one point, she and her children went over to Joy's house for an hour or two to get on the computer and play games. When Mary and the children left their house, appellant, Witcher, Snow-Veley and Ratchet were in the basement and Zahara, Mary's "daughter which is also Michael's sister," was on the front porch smoking marijuana.

{¶ 83} Mary testified she was called back to her house by Joy's niece because Zahara and Ratchet had been in a car accident. Ratchet had been driving Zahara in Snow-Veley's girlfriend's car and wrecked it, but was able to drive the car back to Mary's house. Ratchet and Zahara came into Mary's house, but Snow-Veley was not with them. Mary did not understand why Ratchet was driving the car, and Joy's niece said Snow-Veley had left. Mary waited up for Snow-Veley thinking "there is going to be fireworks" when he gets home. About midnight or one in the morning, Mary went to bed.

{¶ 84} The next morning when Mary woke up, the wrecked car was gone so she thought Snow-Veley had come home. Mary was told Snow-Veley did not come home, so Mary's children called around to see where he was. The girl who owned the car had Snow-Veley's phone and had called all of the numbers in the phone. No one could locate Snow-Veley, so the police were called.

{¶ 85} Mary said Snow-Veley had a lot of enemies and had been shot when he was younger, about 15 years old. To make money, Snow-Veley would break into houses.

* * *

24

{¶ 92} A review of the record shows the state alleged appellant killed Snow-Veley because Snow-Veley was "running his mouth" about killing Montelle and complaining about not being paid.  The state presented the following evidence in support of its allegations: appellant took out numerous life insurance policies on Snow-Veley; appellant solicited Christian Jackson to kill Snow-Veley and gave Jackson a gun; appellant told police he was cooking for the Memorial Day party while Mary Taylor testified she cooked for the party and appellant does not cook; appellant said he was not out of Joy's sight for more than five minutes while Mary testified she and her children were over at Joy's on the computer and playing games for an hour or two; Ratchet was driving Snow-Veley's girlfriend's car; Witcher testified about Snow-Veley's murder and the relocation of the body afterwards; and Tenille testified about the life insurance policies on Snow-Veley.

{¶ 93} Upon a review of all of the evidence in the record, we find the jury, as the trier of fact, did not lose its way in evaluating the evidence and drawing inferences from the evidence presented.  The jury found the testimony of the state's witness was credible while appellant's testimony was not credible.  The jury's conclusion is not unreasonable.  Therefore, we find appellant's conviction for the aggravated murder of Christian Snow-Veley is not contrary to the manifest weight of the evidence.  Accordingly, appellant's second assignment of error is not well-taken as to his conviction for the aggravated murder of Christian Snow-Veley.

ECF Doc. 7-1 at 76-102.

**VII.    Analysis**

**A.    Ground One**

In Ground One, Taylor seeks habeas relief based on his claim that the trial court improperly admitted hearsay testimony, in violation of his Sixth Amendment right to confront witnesses against him.  ECF Doc. 1 at 4; ECF Doc. 8 at 8-9.  Specifically, Taylor asserts that the trial court should not have permitted Shawnita Williams to testify "about a conversation she had with Snow[-]Veley," because he had no opportunity to cross-examine Snow-Veley.  ECF Doc. 8 at 8-9.

25

### 1.    Procedural Default

Taylor's Ground One Confrontation Clause claim was procedurally defaulted.  Although Taylor raised this claim in his direct appeal to the Ohio Court of Appeals and in his state post-conviction petition, he failed to "fairly present" his claim at each level of the state courts' ordinary review process.  *O'Sullivan*, 526 U.S. at 848; *Williams*, 460 F.3d at 806; *McMeans*, 228 F.3d at 681; *Baston*, 282 F. Supp. 2d at 661; ECF Doc. 7-1 at 19-25, 145-60.  Taylor denied the state courts the opportunity to resolve his Ground One claim when he failed to file: (1) a timely direct appeal to the Ohio Supreme Court to challenge the Ohio Court of Appeals' September 2016 decision; or (2) any appeal from the state trial court's February 2017 decision dismissing his post-conviction petition.  Further, Taylor can no longer present his Ground One claim to the Ohio Supreme Court or appeal the denial of his post-conviction petition, because the time for doing so has passed.  *See* Ohio S. Ct. Prac. R. 7.01(A)(1), (4); Ohio R. App. P. 4(A)(1), (B)(2)(D).  Here, Taylor's unsuccessful motion to file a delayed appeal to the Ohio Supreme Court was insufficient to "fairly present" his claim to the Ohio Supreme Court, because the denial of his motion precluded him from asserting the legal and factual basis for his claim to the Ohio Supreme Court.  *O'Sullivan*, 526 U.S. at 848; *Williams*, 460 F.3d at 806; *McMeans*, 228 F.3d at 681; *Koontz*, 731 F.2d at 368; ECF Doc. 7-1 at 107-13, 144.  Moreover, even if Taylor had argued that the Ohio Supreme Court improperly denied his motion for a delayed appeal – something he has not asserted – that argument would fail, because state law violations are not cognizable on habeas review.  *Estelle*, 502 U.S. at 68; *Lewis*, 497 U.S. at 780; *Allen*, 845 F.2d at 614.  Thus, because Taylor failed to fairly present his confrontation claim to the Ohio Supreme Court, and because state law no longer allows him to raise that claim, it is procedurally

defaulted.  *Wainwright*, 433 U.S. at 80, 84-87; *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806; *Baston*, 282 F. Supp. 2d at 661.

Taylor asserts that he had good cause for failing to comply with the deadline to appeal to the Ohio Supreme Court, because: (1) his appeal was due on October 31, 2016; (2) the "weekend" caused his appeal to arrive on November 2, 2016; and (3) his appeal was docketed two days late because the Ohio Court of Appeals' Clerks Office did not have a filing clerk present when his appeal package arrived.  ECF Doc. 8 at 2.  Thus, Taylor asserts that his delay was not attributable to him.  *Id.*  Taylor also contends that he would suffer prejudice if this court did not hear his claim, because he is serving two consecutive life sentences.  *Id.*

Taylor cannot overcome his procedural default.  Taylor is correct that his appeal to the Ohio Supreme Court was due on Monday, October 31, 2016 – 45 days after the Ohio Court of Appeals' September 2016 decision affirming his convictions and sentences.  Ohio S. Ct. Prac. R. 7.01(A)(1); ECF Doc. 7-1 at 75-103.  The record also indicates that, between October 27 and 31, 2016, Taylor submitted to prison authorities legal mail deliverable to the Ohio Supreme Court Clerk of Court at 65 Front Street, Columbus, Ohio.  ECF Doc. 7-1 at 110-11, 143.  Nevertheless, Taylor has not produced evidence showing that: (1) the legal mail he submitted contained both a notice of appeal and a memorandum in support of jurisdiction; or (2) that, if it did include those items, he raised his Ground One claim in them.  Thus, even assuming prison and court logistical errors caused his legal mail to arrive late to the Ohio Supreme Court, Taylor has not carried his burden to prove that his failure to raise timely his confrontation claim to the Ohio Supreme Court was not attributable to him.  *Coleman*, 501 U.S. at 750.  Therefore, he has not shown good cause.  *Id.*

Even if this court were to find that Taylor had good cause for failing to comply with his filing deadline, however, he has not shown prejudice.  Here, this court must assume that the trial court violated Taylor's right of confrontation when it admitted Shawnita Williams' testimony about Snow-Veley's out-of-court statements.  *Moore*, 74 F.3d at 691-92; *Frady*, 456 U.S. at 170-72.  Nevertheless, even if Williams' testimony were excluded, the jury could have found Taylor guilty of Montelle Taylor's and Snow-Veley's murders based on other evidence in the record – including: (1) testimony from Eycke, Kutz, Riley, Witcher, Smith, Mary Taylor, Ankney, Galloway, Jackson, and Colvin; (2) Taylor's application for 11 life insurance policies on Montelle and 6 life insurance policies on Snow-Veley; and (3) the recordings of the police's interviews of Taylor.  *See* ECF Doc. 7-1 at 76-102 (¶¶26-41, 49-60, 73-85).  Thus, Taylor cannot show that the admission of Williams' testimony, if constitutionally erroneous, prejudiced his case.  *Coleman*, 501 U.S. at 750; *Mason*, 320 F.3d at 629.

Moreover, Taylor has not produced any new, reliable evidence not presented at trial demonstrating that he is factually innocent and that his conviction was a fundamental miscarriage of justice.  *Lundgren*, 440 F.3d at 764; *Bousley*, 523 U.S. at 623; *Schlup*, 513 U.S. at 324.  Therefore, Taylor has not overcome his procedural default on his claim that the admission of Williams' testimony regarding Snow-Veley's out-of-court statements violated his Sixth Amendment rights.

I recommend Taylor's Ground One claim be dismissed as procedurally defaulted. Accordingly, this Court need not reach the merits of Taylor's Ground One claim.

### 2.    Merits

The court is not required to dispose of Taylor's Ground One claim on procedural grounds.  When a claim plainly lacks merit, the court has the option to dispose of the claim on the merits.

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  This procedural guarantee commands that defendants be provided the opportunity to test the reliability of evidence "'in the crucible of cross-examination.'"  *Haliym v. Mitchell*, 492 F.3d 680, 710 (6th Cir. 2007) (quoting *Crawford v. Washington*, 541 U.S. 36, 62 (2004)).  In *Crawford*, the Supreme Court held that the Confrontation Clause precludes courts from admitting "testimonial statements" by a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine him.  *Crawford*, 541 U.S. at 59-60, 68-69.  When a statement is "nontestimonial," however, the constitution "afford[s] the States flexibility in their development of hearsay law."  *Id.* at 68.  The Supreme Court declined to provide a comprehensive definition of what constituted a "testimonial" statement, but ruled that it applied at a minimum to prior testimony at a preliminary hearing, before a grand jury, at a formal trial, or in police interrogations.  *Id.*  The Court also provided a "core class of testimonial statements," which includes ex parte in-court testimony, affidavits, depositions, and confessions.  *Id.* at 51-52.  Even when a declarant's statements are deemed to have been testimonial, however, a defendant cannot invoke the Confrontation Clause when he killed the declarant.  *See United States v. Garcia-Meza*, 403 F.3d 364, 370 (6th Cir. 2005) (citing *Crawford*, 541 U.S. at 62 ("[T]he rule of

29

forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds.").

In determining whether statements are testimonial, the Sixth Circuit has directed courts to "ask whether the declarant 'intend[ed] to bear testimony against the accused,'" – that is, "'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).  Statements found to be nontestimonial include: (1) casual statements to a loved one, friend, or acquaintance; (2) secretly recorded statements to a friend; (3) statements by a co-conspirator made in pendency and furtherance of a conspiracy; (4) statements made to a confidential informant whose status as such was unknown to the declarant; and (5) a co-defendant's statements to an undercover officer whose status was unknown to the declarant.  *See Johnson*, 581 F.3d at 325 (collecting cases); *United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (collecting cases); *see also Crawford*, 541 U.S. at 56 (noting that statements in furtherance of a conspiracy are "by their nature . . . not testimonial").

Taylor's Confrontation Clause rights were not violated by the admission of Snow-Veley's statements to Williams, because they were nontestimonial.  *Crawford*, 541 U.S. at 59-60, 68-69.  Williams's testimony – that Snow-Veley told her Taylor hired him to kill Montelle and paid him "now and then," and that Snow-Veley knew Taylor would cause him harm someday – centered on a conversation that Snow-Veley had with his girlfriend (Williams) after she picked him up.  ECF Doc. 7-1 at 76-102 (¶¶20-23).  Such a conversation is similar to casual statements to a loved one or friend, which the Sixth Circuit has found nontestimonial.  *Johnson*, 581 F.3d at 325; *Franklin*, 415 F.3d at 545-46.  Furthermore, there is no indication in the record

that Snow-Veley (or a reasonable person in his position) would have anticipated his statement his girlfriend would be used in a criminal investigation or prosecution. *Johnson*, 581 F.3d at 325; *Cromer*, 389 F.3d 662, 675.  Thus, Snow-Veley's statements were nontestimonial, and their admissibility turned on the state courts' interpretation of state hearsay law. *Crawford*, 541 U.S. at 68.  This court is not authorized in a federal habeas case to review the Ohio courts' interpretation of Ohio hearsay law. *See Estelle*, 502 U.S. at 68.  Moreover, even if Snow-Veley's statements to Williams were deemed to be testimonial, Taylor could still not invoke the Confrontation Clause against Williams' hearsay testimony, because other independent evidence in the record showed that Taylor killed Snow-Veley. *Garcia-Meza*, 403 F.3d 364, 370; *Crawford*, 541 U.S. at 62; ECF Doc. 7-1 at 76-102 (¶¶73-85).  Accordingly, should the court opt to rule on the merits of Taylor's Ground One claim, I recommend that the claim be denied for lack of merit under 28 U.S.C. § 2254.

### B. Ground Two

Taylor's Ground Two claim seeks habeas relief based on his contention that the Ohio Court of Appeals' decision – finding that the trial court did not err in admitting testimony about Snow-Veley's out-of-court statements – was unreasonable and clearly contrary to well established federal law." ECF Doc. 1 at 5; ECF Doc. 8 at 10.  Specifically, Taylor asserts that the Ohio Court of Appeals' decision was contrary to: (1) "evidence rules and federal laws" requiring murders to be proven by "audio tape, video tape, or independent witness" testimony; and (2) "Hearsay Rule 804(B)(3) when the trial court allowed the witness to testify that they heard a {Deceased} man say petitioner was involved in this case." ECF Doc. 1 at 5; ECF Doc. 8 at 10.  Taylor contends that, because he was not found guilty of a conspiracy, the court of appeals could not have upheld his murder conviction. ECF Doc. 1 at 5; ECF Doc. 8 at 10.

### 1.  Procedural Default

Taylor's Ground Two claim was procedurally defaulted.  Taylor never "fairly presented" his claim – that the Ohio Court of Appeals decision affirming the admission of hearsay evidence and his conviction for murder was contrary to or involved an unreasonable application of federal law – to the Ohio Supreme Court.  ECF Doc. 7-1 at 19-25, 145-60, 268-342.  As discussed above, Taylor deprived the state courts of an opportunity to fully and fairly review any of his claims when he failed to: (1) timely commence an Ohio Supreme Court appeal the Ohio Court of Appeals' September 2016 decision; or (2) appeal the trial court's denial of his post-conviction petition.  *Wainwright*, 433 U.S. at 80, 84-87; *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806; *Baston*, 282 F. Supp. 2d at 661; *see also* Ohio S. Ct. Prac. R. 7.01(A)(1), (4); Ohio R. App. P. 4(A)(1), (B)(2)(D).

Taylor also cannot overcome his procedural default of Ground Two.  As discussed above, Taylor has not shown good cause for his procedural default because he has not produced evidence showing that the legal mail he submitted to prison authorities between October 27 and 31, 2016, contained a notice of appeal and memorandum in support of jurisdiction raising his Ground Two claim.  *Coleman*, 501 U.S. at 750.  Furthermore, because the record contained other evidence tying Taylor to the murders of Montelle Taylor and Christian Snow-Veley, Taylor cannot show that the jury's verdicts would have been different had the Ohio Court of Appeals ruled that the trial court erred in admitting hearsay testimony regarding Snow-Veley's statements as statements by a co-conspirator.  *Coleman*, 501 U.S. at 750; *Mason*, 320 F.3d at 629; *see generally* ECF Doc. 7-1 at 76-102 (¶¶26-41, 49-60, 73-85).  Further, as discussed above, Taylor has presented no new, reliable evidence to support a claim of actual innocence or otherwise provided this court a basis upon which to conclude that leaving his conviction undisturbed would

be a fundamental miscarriage of justice.  Therefore, Taylor cannot overcome his procedural default of Ground Two.

I recommend Taylor's Ground Two claim be dismissed as procedurally defaulted. Accordingly, this Court need not reach the merits of Taylor's Ground Two claim.

### 2.    Cognizability

Even if this Court were to look past Taylor's procedural default of his Ground Two claim, the claim must be dismissed because it does not allege a violation of federal constitutional law.  Because Taylor was charged under Ohio's murder statute and prosecuted in Ohio state court, the prosecutor's proof burden came from Ohio Rev. Code § 2903.01, and the admissibility of evidence was governed under the Ohio Rules of Evidence.  *Compare* Ohio Evid. R. 101(A) ("These rules govern proceedings in courts of this State."), *with* Fed. R. Evid. 1101(a) (providing that the Federal Rules of Evidence apply to proceedings before United States courts).  Even if this court accepted as true Taylor's claim that the Ohio Court of Appeals unreasonably upheld the trial court's admission of hearsay evidence in violation of Ohio Evid. R. 804(B)(3), this court would have no authority to grant federal habeas relief under 28 U.S.C. § 2254 because such relief does not lie for errors of state law.  *Estelle*, 502 U.S. at 68; *Lewis*, 497 U.S. at 780; *see also Foley v. Parker*, 488 F.3d 377, 384 (6th Cir. 2007) ("A trial judge's decision concerning the admission of evidence is a state-law matter generally not subject to habeas review."). Furthermore, Taylor cannot convert his Ground Two claim into a due process claim, because he does not argue that the trial court's evidentiary decisions resulted in a fundamentally unfair trial. *Rivera v. Illinois*, 556 U.S. at 158; *Isaac*, 456 U.S. at 121 n.21; *Seymour*, 224 F.3d at 552.  Thus, Taylor's Ground Two claim raises only noncognizable state law issues that we are not permitted to overturn.

Moreover, Taylor's claim would fail even if this court construed it to state a due process claim and were to review it on the merits. Here, Taylor's conclusory assertions that the Ohio Court of Appeals violated "federal law" and citation to the Sixth Circuit's decision in *Fuson v. Jago*, 773 F.2d 55, 59-61 (6th Cir. 1985) (finding that the admission of an officer's testimony regarding a deceased co-defendant's confession violated the confrontation clause) – without citation to any Supreme Court decisions – is insufficient to show that the state court arrived at conclusion contrary to, or decided a factually indistinguishable case differently from, the Supreme Court. *Williams*, 529 U.S. at 412-13; ECF Doc. 1 at 5; Doc. 8 at 10, 13. Thus, Taylor cannot meet his burden under § 2254(d)(1). *Lockyer*, 538 U.S. at 71-72; *White*, 572 U.S. at 420; 28 U.S.C. § 2254(d)(1).

Accordingly, if the Court does not dismiss Taylor's Ground Two claim based on procedural default, I recommend that the Court dismiss his Ground Two claim as not cognizable.

### C. Ground Three

Taylor's Ground Three claim seeks habeas relief based on his contention that his murder convictions were against the manifest weight of evidence. ECF Doc. 1 at 6-7. Specifically, Taylor asserts that the Ohio Court of Appeals erroneously failed to consider a forensic expert opinion report, which indicated that: (1) Snow-Veley's blood was not found in the house where witnesses said the shooting occurred; and (2) investigators never recovered 9 out of the 17 bullet casings. ECF Doc. 1 at 6-7; ECF Doc. 8 at 10-11. Taylor also states that he "object[s] to all claims of procedural default." ECF Doc. 8 at 11.

### 1. Procedural default

Taylor's Ground Three claim was procedurally defaulted. Although Taylor raised his manifest weight claim in his direct appeal to the Ohio Court of Appeals, he failed to "fairly

34

present" his claim at each level of the state court's ordinary review process. *O'Sullivan*, 526 U.S. at 848; *Williams*, 460 F.3d at 806; *McMeans*, 228 F.3d at 681; *Baston*, 282 F. Supp. 2d at 661; ECF Doc. 7-1 at 19-25.  As discussed above in Grounds One and Two, Taylor denied the state courts the opportunity to resolve his manifest weight claim because: (1) he failed to file a timely direct appeal in the Ohio Supreme court to challenge the Ohio Court of Appeals' September 2016 decision; and (2) he can no longer present his manifest weight claim to the Ohio Supreme Court.  *See* Ohio S. Ct. Prac. R. 7.01(A)(1), (4).  Taylor's unsuccessful motion to file a delayed appeal to the Ohio Supreme Court was insufficient to "fairly present" his claim to the Ohio Supreme Court, because the denial of his motion precluded him from asserting the legal and factual basis for his claim to the Ohio Supreme Court.  *O'Sullivan*, 526 U.S. at 848; *Williams*, 460 F.3d at 806; *McMeans*, 228 F.3d at 681; *Koontz*, 731 F.2d at 368; ECF Doc. 7-1 at 107-13, 144.  Thus, because Taylor failed to fairly present his manifest weight of the evidence claim to the Ohio Supreme Court, and because state law no longer allows him to raise that claim, it is procedurally defaulted.  *Wainwright*, 433 U.S. at 80, 84-87; *Engle*, 456 U.S. at 125 n.28; *Williams*, 460 F.3d at 806; *Baston*, 282 F. Supp. 2d at 661.

As with Grounds One and Two, Taylor cannot overcome his procedural default of Ground Three.  For the same reasons Taylor failed to show good cause for his default of Grounds One and Two, Taylor cannot show good cause for failing to timely present his Ground Three claim to the Ohio Supreme Court.  *Coleman*, 501 U.S. at 750.  Further, even if the Ohio Court of Appeals committed a constitutional level error by not considering the forensic expert reports, Taylor has not shown that the failure prejudiced his case.  *Moore*, 74 F.3d at 691-92; *Frady*, 456 U.S. at 170-72.  Because the Ohio Court of Appeals could have reasonably found that the jury reasonably relied upon other evidence in the record to find Taylor guilty on both murder charges,

Taylor cannot show that the outcome of his case would have been different if the Ohio Court of Appeals had further considered and discussed the forensic expert reports.  *Coleman*, 501 U.S. at 750; *Mason*, 320 F.3d at 629; *see also* ECF Doc. 7-1 at 76-102 (¶¶26-41, 49-60, 73-85). Moreover, Taylor has not produced any new, reliable evidence not presented at trial demonstrating that he is factually innocent or that a fundamental miscarriage of justice would occur if this court does not entertain his manifest weight of the evidence claim.  *Lundgren*, 440 F.3d at 764; *Bousley*, 523 U.S. at 623; *Schlup*, 513 U.S. at 324.  Therefore, Taylor has not overcome his procedural default on his Ground Three claim.

I recommend Ground Three of Taylor's petition be dismissed as procedurally defaulted. Accordingly, this Court need not reach the merits of Taylor's Ground Three claim.

### 2.    Cognizability

Even if this court were to look past Taylor's procedural default of Ground Three, his "manifest weight" claim is not cognizable on federal habeas review.  An argument that a conviction as against the manifest weight of evidence is a state-law argument.  *See Nash v. Eberlin*, 258 F. App'x 761, 764 n.4 (6th Cir. 2007); *Schwarzman v. Gray*, No. 17-3859, 2018 U.S. App. LEXIS 27193 *8 (6th Cir. 2018) (unpublished) ("A manifest-weight-of-the-evidence claim in Ohio is a state law claim that is similar to but ultimately different from a federal constitutional claim that the evidence was insufficient to support a conviction.").  Because Taylor's manifest weight claim is a state law claim, it is not cognizable on federal habeas review. *Estelle*, 502 U.S. at 68; *Lewis*, 497 U.S. at 780.  Therefore, I recommend that Taylor's Ground Three claim be dismissed on the additional ground that it is noncognizable.

36

### 3.       Sufficiency of the Evidence

When a *pro se* petitioner raises an incognizable manifest weight argument, the district court may construe that argument to raise a cognizable sufficiency-of-the-evidence claim.  *See Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) ("The allegations of a pro se habeas petition, 'though vague and conclusory, are entitled to a liberal construction.'  The appropriate liberal construction requires active interpretation in some cases to construe a pro se petition 'to encompass any allegation stating federal relief.'" (citations omitted)); *Nash*, 258 F. App'x at 764-65 & n.4 (noting that a manifest weight argument can be construed as a sufficiency argument, because a manifest weight argument necessarily subsumes a sufficiency of the evidence argument).  "The Fourteenth Amendment's Due Process Clause 'protects the accused against conviction except upon proof beyond a reasonable doubt." *Thomas v. Stephenson*, 898 F.3d 693, 702 (6th Cir. 2018) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  When a criminal defendant alleges that the evidence adduced at trial was insufficient to support his conviction, the court must determine whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On habeas review, this inquiry is further filtered through the deferential standard of 28 U.S.C. § 2254(d). *Davis v. Lafler*, 658 F.3d 525, 531-35 (6th Cir. 2011) (*en banc*) (explaining that a state court's decision in a federal habeas sufficiency-of-the-evidence challenge receives "double deference" – first, to the jury's verdict, and second, to the state court's consideration of the verdict); *see also* 28 U.S.C. § 2254(d); *Harrington*, 526 U.S. at 88, 98-99, 102-03; *Schriro*, 550 U.S. at 473. Thus, a federal habeas court reviewing a sufficiency-of-the-evidence claim must determine whether the state appellate court reasonably concluded that the trial evidence was sufficient for a rational trier of

fact to find the essential elements of the crime beyond a reasonable doubt.  The sufficiency of the

evidence determination is based on all of the evidence, even evidence erroneously admitted.

*McDaniel v. Brown*, 558 U.S. 120, 131 (2010).

Ohio's aggravated murder statute provides that "[n]o person shall purposely, and with

prior calculation and design, cause the death of another."  Ohio Rev. Code § 2903.01(A) (2015).

A person who hires another to commit a murder may be said to have "caused the death of

another" under Ohio's aggravated murder statute.  *Cf.* Ohio Rev. Code § 2923.03 (2015)

(providing that one who, with the requisite culpability for the commission of a principal offense,

solicits or procures another to commit the offense "shall be prosecuted and punished as if he

were a principal offender," and that "[a] charge of complicity may be stated in the terms of this

section, or in terms of the principal offense"); *see also State v. Williams*, 528 N.E.2d 910 (Ohio

1988) (affirming the conviction for aggravated murder under § 2903.01 and imposition of the

death penalty for a defendant who hired someone and supplied a weapon for the killing of

another); *State v. Robb*, 723 N.E.2d 1019, 1041 (Ohio 2000) (rejecting in dicta the proposition

that a "boss of a criminal enterprise" who orders a murder could not receive the death penalty for

aggravated murder by complicity).  A person convicted of aggravated murder is subject to a

sentence of death or life imprisonment.  Ohio Rev. Code §§ 2903.01(F) (2015), 2929.02(A)

(2015).  A defendant is subject to a mandatory, consecutive three-year prison term if he "had a

firearm on or about the offender's person or under the offender's person or under the offender's

control while committing the offense and displayed the firearm, brandished the firearm, indicated

that the offender possessed the firearm, or used it to facilitate the offense."  Ohio Rev. Code

§ 2941.145(A) (2015); *see also* Ohio Rev. Code § 2929.14(B)(1)(a)(ii) (2015).

Even if the court construed Taylor's Ground Three claim to challenge the sufficiency of the evidence, his claim would fail for lack of merit.  Taylor has not shown that the state courts could not have reasonably found that the trial evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that Taylor committed the essential elements or the aggravated murders of Montelle Taylor and Christian Snow-Veley.  *Harrington*, 562 U.S. at 98-99; *Jackson*, 443 U.S. at 319; *Schriro*, 550 U.S. at 473; *Davis*, 658 F.3d at 531-35; 28 U.S.C. § 2254(d). Here, the prosecution presented witness testimony and documents showing that: (1) Taylor applied for and took out numerous insurance policies on Montelle before he was killed; (2) he promised to pay, and paid, Snow-Veley and Jackson to kill Montelle; (3) he told Snow-Veley and Jackson that he wanted to use the insurance proceeds to help Michael Taylor III; (4) he gave Snow-Veley a gun; (5) Snow-Veley and Jackson killed Montelle; (6) Snow-Veley had a gun when he fled the murder scene; and (7) Taylor went to the hospital to establish an alibi and told his brother that Montelle was dead before the nurse told him about the shooting.  ECF Doc. 7-1 at 76-102 (¶¶ 23-42, 49-60, 69).  The prosecution also presented evidence that Taylor: (1) applied for and took out numerous life insurance policies on Snow-Veley before he was killed; (2) asked Jackson to kill Snow-Veley for "running his mouth" and gave him a gun; (3) instructed Witcher to lay down carpet to  prevent any blood stains after he invited Snow-Veley to his house; (4) placed a sweet potato on a revolver and shot Snow-Veley numerous times; (5) gave Ratchet another gun to shoot Snow-Veley with; and (6) made efforts to clean up the house and conceal Snow-Veley's body in an abandoned building.  ECF Doc. 7-1 at 76-102 (¶¶ 59, 73-85). Based the above evidence, the state courts could have reasonably determined that the trial evidence was sufficient for a rational trier of fact to determine that Taylor: (1) purposely, and with prior calculation and design, caused Montelle's and Snow-Veley's deaths; and (2) used,

controlled, or possessed a firearm during, or to facilitate, the murders.  Ohio Rev. Code §§ 2903.01(A), 2923.03, 2929.14, 2941.145(A); *Williams*, 528 N.E.2d 910; *Robb*, 723 N.E.2d at 1041.  Thus, Taylor has not carried his burden to show that the state appellate court could not have reasonably concluded that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Harrington*, 562 U.S. at 98-99; *Jackson*, 443 U.S. at 319; *Schriro*, 550 U.S. at 473; *Davis*, 658 F.3d at 531-35; 28 U.S.C. § 2254(d).  Accordingly, should the Court choose to construe Taylor's Ground Three claim to be a sufficiency-of-the-evidence challenge, I recommend that Taylor's Ground Three claim be denied for lack of merit.

## VIII.  Summary of Findings and Recommendations

Taylor's claims all fail as a matter of law for the following summarized reasons:

**Ground One:**  Procedural default and lack of merit.

**Ground Two:**  Procedural default and no cognizable federal constitutional issue raised.

**Ground Three:**  Procedural default, no cognizable federal constitutional issue raised, and, if deemed to raise a federal constitutional issue, lack of merit.

## IX.  Certificate of Appealability

### A.  Legal Standard

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability and specifies the issues that can be raised on appeal.  28 U.S.C. § 2253(c).  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Supreme Court has interpreted this standard to mean that the "'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'"  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v.*

40

*McDaniel*, 529 U.S. 473, 484 (2000)). The granting of a certificate of appealability does not require a showing that the appeal would succeed on any claim. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

      **B.**    **Analysis**

When a petition is to be dismissed on a procedural basis, the inquiry under § 2253(c) is two-fold. In such cases, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 485. As the Supreme Court explained, "[w]here a plain procedural bar is present, and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further. In such a circumstance, no appeal would be warranted." *Id.* at 486. If the Court accepts my recommendations, Taylor will not be able to show that the Court's rulings on his procedurally defaulted, meritless, and non-cognizable claims are debatable. Thus, I recommend that no certificate of appealability be issued.

## X.      Recommendation

I recommend that the Court DISMISS each of Taylor's three grounds for relief and

DENY Taylor's petition for writ of habeas corpus (ECF Doc. 1).  I further recommend that

Taylor not be granted a certificate of appealability.

Dated: June 10, 2019

Thomas M. Parker
United States Magistrate Judge

_____

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts
within fourteen (14) days after being served with a copy of this document.  Failure to file
objections within the specified time may waive the right to appeal the District Court's order.  *See
United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140
(1985), *reh'g denied*, 474 U.S. 1111 (1986).